## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  Case No.

MIHIR TANEJA,

      Defendant.

_____/

## <u>COMPLAINT</u>

The United States of America (the "United States" or the "Government"), on behalf of the United States Department of Defense ("DOD"), brings this action against Defendant Mihir Taneja.

## I.    INTRODUCTION

1.      This is a civil action brought by the United States against Taenja under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and the common law, to recover treble damages sustained by, and civil penalties owed to, the United States based on Defendant's illegal scheme to knowingly cause false or fraudulent claims for compounded drugs to be presented to TRICARE, the federal health care program for active duty military personnel, retirees, and their families.  As part of the scheme, Defendant Taneja caused a pharmacy to pay kickbacks to marketers to target military members and their families for prescriptions for compounded medicated pain creams and scar creams, regardless of need.  Those kickbacks tainted the claims presented to

TRICARE and rendered them non-reimbursable, and thus false and fraudulent.

2.      As set forth below, as part of this scheme, from September 2014 to February 2015, Defendant Taneja, working with his business partner Larry Smith, caused the submission of claims to TRICARE, via Defendant Z Stat Medical LLC d/b/a/ Oldsmar Pharmacy ("Oldsmar Pharmacy"), for reimbursement for compounded drugs that were false or fraudulent because they were tainted by kickbacks to marketers. Specifically, as a result of an agreement Taneja helped to negotiate, Oldsmar Pharmacy shared a percentage of the profits – the kickbacks – with a marketing company, Centurion Compounding, Inc., that generated referrals of compounded drug prescriptions to Oldsmar Pharmacy.

## II.     PARTIES AND RELEVANT ENTITIES

3.      Plaintiff the United States brings this action on behalf of the DOD, including its component, the Defense Health Agency ("DHA") as administrator of the TRICARE program, formerly known as CHAMPUS.

4.      Defendant Mihir Taneja resides in Tampa, Florida and operates various businesses located in Largo, Florida, primarily in the healthcare field.

5.       Z-Stat Medical LLC d/b/a Oldsmar Pharmacy had a principal address of 34911 US Hwy 19 N  Palm Harbor, FL 34684.  Larry Smith was the President, and the company was registered as being managed by Stat Direct LLC ("Stat Direct").  Oldsmar Pharmacy advertised itself as the specialty compounding division of Stat Direct.

6.      Centurion Compounding, Inc. was a marketing company co-owned and co-operated by Frank V. Monte and Kimberly S. Anderson.

### III.     JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, because this action is brought by the United States as a Plaintiff pursuant to the False Claims Act.

8.     This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant resides or transacts business in the Middle District of Florida.

9.     Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendant resides or transacts business in this District.

### IV.     BACKGROUND

#### A.     The False Claims Act and Anti-Kickback Statute

10.     The FCA establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  "Knowingly" is defined to include actual knowledge, reckless disregard, or deliberate indifference.  Id. at § 3729(b)(1).  No proof of specific intent to defraud is required.  Id.

11.     The Anti-Kickback Statute ("AKS") arose out of congressional concern that inducements may corrupt patient and professional health care decision-making, impose higher costs on federal health care programs, and divert federal funds towards goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the federal health care programs from these

harms, Congress enacted a prohibition against the payment of kickbacks in any form.

The AKS makes it illegal for an individual or entity to knowingly or willfully:

> [O]ffer[] or pay [] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

12.     A claim for reimbursement from a federal health care program for items or services that resulted from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA.  42 U.S.C. § 1320A-7b(g).

13.     The AKS contains several exceptions to which the prohibition against providing compensation in exchange for referrals or orders does not apply.  The "bona fide employment" exception provides that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate the AKS.  42 U.S.C. § 1320a-7b(b)(3)(B).  This type of compensation to bona fide employees is exempt from the statute's prohibitions because the control that employers exercise over bona fide employees reduces the potential for abuse.  See Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952 (July 29, 1991).

14.     As set forth in more detail below, Defendant Taneja knowingly and

willfully caused Oldsmar Pharmacy to pay remuneration to marketers to obtain referrals for compound drug prescriptions that were reimbursed by TRICARE.

15.     By providing kickbacks to induce prescriptions for compounded drugs reimbursed by TRICARE, Taneja knowingly caused to be presented false or fraudulent claims to the TRICARE program.

16.     TRICARE is a federal health care program, as defined in the AKS, 42 U.S.C. § 1320a-7b.  DHA, a component of the DOD, administers TRICARE, which provides health care insurance for active duty military personnel, military retirees, and military dependents.

17.     TRICARE contracts with Express Scripts, Incorporated ("ESI") to administer the prescription drug coverage of the TRICARE program, including the processing and payment of claims for reimbursement from TRICARE for compounded prescription drugs.

18.     At all relevant times, TRICARE covered compounded drugs that are medically necessary and proven to be safe and effective.  32 C.F.R. § 199.4(g)(15). Compounding is the practice in which a licensed pharmacist or physician combines, mixes, or alters the ingredients of a drug to create a medication tailored to the needs of an individual patient.  A patient may need a compounded drug, for example, if she is allergic to an ingredient in a manufactured drug.

19.     Each compounded drug claim submitted by a pharmacy for reimbursement from TRICARE generally includes specific representations about the date of service, the patient on whose behalf payment is being sought, the provider who prescribed the

medication, and the individual ingredients contained in the compounded drug.

20.     From at least September 1, 2014 to May 1, 2015, TRICARE reimbursed pharmacies for all the ingredients in a compounded drug.  During this period, retail or mail-order pharmacies generally were paid the "average wholesale price" of each ingredient in a compounded drug minus a negotiated discount.

21.     On March 5, 2015, TRICARE publicly announced that beginning on May 1, 2015, it would screen "all ingredients in compound drug claims to ensure they are safe and effective and covered by TRICARE."  The new screening process checked to ensure that the ingredients were lawfully marketed in the United States, were safe and effective, and were medically necessary.  To the extent drugs were rejected by the screening process, a doctor could request prior authorization for the compound.  TRICARE paid far fewer claims for compounded drugs after implementing these changes on May 1, 2015.

22.     At all relevant times, TRICARE beneficiaries were responsible for making a copayment and thus sharing in the costs of compounded drug prescriptions filled by a retail or mail-order pharmacy.  10 U.S.C. § 1074g(a)(6); TRICARE Reimbursement Manual, Chapter 2, Addendum B.

23.     A pharmacy seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions, including not submitting claims that arise from fraud.  32 C.F.R. § 199.9(a)(4).  Such fraud includes improper commission and kickback arrangements.  Id. at § 199.9(c)(12).  Abusive situations include the routine waiver of patient copayments.  Id. at § 199.9(b)(1).

24.     Fraud or abuse by a pharmacy may result in the denial of the pharmacy's

claims or the exclusion or suspension of the pharmacy from participation in the

TRICARE program.  32 C.F.R. § 199.9(b), (f).

25.    To receive reimbursement from TRICARE for compounded drugs, a

pharmacy must enter into a Provider Agreement with ESI, TRICARE's pharmacy

benefits manager.

26.    TRICARE regulations specify that "[a]ll fraud, abuse, and conflict of

interest requirements [in section 199.9] are applicable to the TRICARE pharmacy

benefits program."  32 C.F.R. § 199.21(p).  TRICARE's contract with ESI also

incorporates the provisions of 32 C.F.R. § 199.

27.    Oldsmar Pharmacy contracted with two Pharmacy Services

Administration Organizations (PSAOs).  Acting as the agent of pharmacies such as

Oldsmar Pharmacy, the PSAOs in turn contracted with ESI.

28.    The PSAOs, on behalf of Oldsmar Pharmacy and others, executed

Provider Agreements with ESI in which Oldsmar Pharmacy promised to:

    a.  "be bound by and comply with the provisions of this Agreement and all

        applicable laws, rules and regulations including, but not limited to, fraud,

        waste and abuse laws…." and

    b.  act "in accordance with the professional standards prevailing in the

        community at the time such services are rendered."

29.    In the Provider Agreements, ESI expressly reserved the right to reverse

any claim that Oldsmar Pharmacy or any pharmacy submitted for a prescription when

that pharmacy "failed to…verify that the prescription was issued in accordance with

applicable laws, rules and regulations."

30.    In addition, Oldsmar Pharmacy promised through the Provider Agreement with ESI to comply with ESI's Provider Manual.

31.    The ESI Provider Manuals in effect during the period from September 1, 2014 to February 28, 2015 required Oldsmar Pharmacy to be aware of and comply with all state and federal law, "including anti-kickback statutes and self-referral statutes."  The Manuals warned that "[f]ailure to demonstrate compliance with these laws may result in immediate termination by [ESI]."

32.    The ESI Provider Manuals in effect during the period from September 1, 2014 to February 28, 2015 also required Oldsmar Pharmacy to "ensure that the correct Copayment is charged" to the patient and "is not changed or waived."  The Manuals further warned that if ESI "becomes aware of any Copayment or cost-sharing discounts offered" by Oldsmar Pharmacy, then Oldsmar Pharmacy "may be subject to immediate termination" from ESI's provider network.

33.    Additionally, TRICARE's coverage of pharmacy services, including compounded drugs, requires that "pharmacies [] meet the applicable requirements of state law in the state in which the pharmacy is located."  32 C.F.R. § 199.6(d)(3); see also TRICARE Policy Manual 6010.57-M, Ch. 8, Sec. 9.1 (Feb. 1, 2008 and April 1, 2015).

## V.    FACTS

### A.    Taneja and Smith's kickback arrangement with Centurion marketing company.

34.    Oldsmar Pharmacy was a compounding pharmacy owned and operated by Taneja's business partner, Larry Smith, although Taneja referred to it as "my" pharmacy

and had to remind himself that Smith was the one on the paperwork owning Oldsmar Pharmacy.  In November 2014, Taneja and Smith entered into a kickback arrangement with Centurion, pursuant to which Oldsmar Pharmacy agreed to pay Centurion a portion of the monies that Oldsmar Pharmacy received in payment from insurance companies for compounded drug prescriptions that Centurion generated and referred to Oldsmar Pharmacy to be filled.

35.     According to Oldsmar Pharmacy's marketing materials, "We know each person is unique, and that's why we customize every prescription to fit each individual's need," and "Our compounding professionals can prepare unique dosage forms containing the best dose of medication for each individual."  In reality, Oldsmar Pharmacy, with the assistance of marketing companies, rather than the prescribing doctors, designed compounds to maximize profits on each prescription.

36.     In May 2014, six months before entering into the kickback arrangement, Taneja emailed Anderson of Centurion saying he would coordinate a call with his partner Larry – i.e., Larry Smith of Oldsmar Pharmacy, who was copied on the email.  Taneja said Smith could put Anderson in touch with "our support staff" if she needed assistance and that Smith handles "all the administrative aspects."  Taneja explained that if Centurion referred compounded drug prescriptions to Oldsmar Pharmacy to fill, Oldsmar Pharmacy would pay Centurion 40% of the amount insurance paid to Oldsmar Pharmacy for those prescriptions.

37.     Instead, Centurion entered into a marketing agreement with the owners of LifeCare Pharmacy, another compounding pharmacy.  Centurion engaged sales

representatives as independent contractors to market expensive compounded medications, specifically creams for pain and scars, among others, to beneficiaries of healthcare plans, especially TRICARE.  Between May 2014 and November 2014, the co-owners of Centurion – Monte and Anderson – directed the patients that Centurion sales representatives had recruited and the physicians in Centurion's network to send all of their compounded cream prescriptions to Centurion, which then transmitted those prescriptions to LifeCare Pharmacy to fill.  In return, LifeCare Pharmacy paid Centurion an illegal kickback of approximately 50% of the amount TRICARE paid for each compounded drug claim.

38.     During this same period, the owners of LifeCare Pharmacy entered into an agreement with the principals of Centurion to pay illegal kickbacks to Dr. Anthony Baldizzi.  Specifically, LifeCare Pharmacy and Centurion agreed to pay Dr. Baldizzi 10 percent of the profit for each paid claim resulting from a prescription for compounded cream written for his patients and filled at LifeCare Pharmacy.

39.     In November 2014, LifeCare Pharmacy started withholding payment of compounded drug commissions from Centurion as the result of an audit by a private insurer.  Centurion did not cease marketing compounded drugs, it merely pivoted and promptly began referring those prescriptions to another pharmacy to pay it commissions. Specifically, Centurion continued to engage sales representatives as independent contractors to market expensive compounded medications, specifically creams for pain and scars, among others, to beneficiaries of healthcare plans, especially TRICARE. Centurion continued to direct the patients that Centurion sales representatives had

recruited and the physicians in Centurion' network to send all of their compounded cream prescriptions to Centurion, which then transmitted them to Oldsmar Pharmacy to fill.

40.     Despite Centurion referring compounded drug prescriptions to Oldsmar Pharmacy in return for a percentage commission on the amount insurance paid for those drugs for a month, by mid-December 2014, Taneja, Smith, and Anderson still had not finalized their financial arrangement.  Thus, on December 12, 2014, when Anderson prepared to create the first list of prescriptions Centurion had sent to Oldsmar Pharmacy and for which Centurion expected to be paid a commission, she emailed Smith to confirm the terms they previously negotiated.  Specifically, Anderson said they would subtract 11% from the adjudication (for the cost of the drug and a referral fee), and then split the remainder.  Smith then forwarded that email to Taneja, who disagreed with Anderson's characterization of the financial agreement and responded to her, "You, Larry [Smith] and I sat in Larry's office and discussed how we were going to distribute money.  As per our discussion, which resulted in a handshake, we agreed to the following.  We would take a 50%/50% split, you would then take off 10% for [Cost of Goods Sold] from your side…."  Similarly, when Anderson contacted Smith by text about the terms of the deal, Smith deferred to Taneja.  Smith could not act alone; he needed Taneja's approval to finalize the agreement.

41.     After further communications, the final arrangement, documented in a mid-December 2014 email between Smith and Anderson, involved taking "15% of [sic] the top, so we split 85 percent profits 50/50 as discussed."

42.     The companies maintained spreadsheets, which Centurion referred to as

commission reports, of all of the prescriptions generated by Centurion, the amounts

received by Oldsmar Pharmacy for claims that the pharmacy submitted to the patients'

insurance for reimbursement, and the amounts Oldsmar Pharmacy owed to Centurion in

commission, thereby documenting the kickback arrangement.  Centurion would provide

the commission reports to Oldsmar Pharmacy to audit.  The commission reports included

prescriptions submitted to and/or paid for by both private insurance and federal health

care programs.

43.     For example, the commission report for December 1, 2014 through

December 15, 2014 identified over $9,700,000 insurance companies had paid to Oldsmar

Pharmacy for compounded drug prescriptions it filled and that had been generated and

referred to it by Centurion, and the over $3,500,000 in commissions that Oldsmar

Pharmacy owed to Centurion pursuant to their agreement.  (The number paid in

commissions does not perfectly match the deal described above because over 100 of the

private sector claims in that spreadsheet were not paid, so no commission for Centurion

was listed.)   Approximately 40% of the prescriptions documented in the spreadsheet

were from TRICARE.

44.     The commission reports showed that the vast majority of prescriptions

from federal beneficiaries were submitted to TRICARE.

45.     The commission reports also documented that particular providers,

including Dr. Anthony Baldizzi, prescribed a large number of prescriptions.

46.     In fact, Centurion generated and referred so many prescriptions to

Oldsmar Pharmacy that Centurion had to send some of its sales representatives to

Oldsmar Pharmacy to help enter data, so that TRICARE and private insurance companies would pay Oldsmar Pharmacy for the prescriptions it filled and, in turn, Oldsmar Pharmacy would pay commissions to Centurion.  Taneja was aware of Centurion providing that assistance and told Anderson the address to which to send the Centurion representatives.

47.     In addition, Oldsmar Pharmacy used employees from Medvest, a separate company owned by Taneja and operated by Smith, to help with the enormous quantity of prescriptions generated by Centurion.

48.     Oldsmar Pharmacy designed prescription pads that Centurion and its sales representatives provided to patients to give to their doctors to fill out that included compound medications that would be reimbursed.  Almost all of the patients who received compounded medication received pain cream or scar cream that had the highest rates of reimbursement on the prescription pad.

49.     In addition, Oldsmar Pharmacy sometimes waived co-payments for prescriptions, in violation of TRICARE regulations and its own policies, in order to encourage patients to continue accepting medications, including when patients expressed they did not want or need them.

50.     Also starting in November 2014, Oldsmar Pharmacy (through Taneja and Smith) and Centurion conferred with attorneys to try to legitimize their illegal kickback arrangement so they could continue it.  Specifically, they tried to create a legal structure under which Centurion could continue to refer prescriptions to Oldsmar Pharmacy to be filled and for which Oldsmar Pharmacy could continue to pay Centurion funds such that

individual marketers could be compensated on a commission basis.  During that time, Oldsmar Pharmacy's attorneys regularly e-mailed with both Taneja and Smith in communications that Smith asserts are privileged.

51.     Specifically, on November 16, 2014, Anderson forwarded Smith an amended Oldsmar Pharmacy operating agreement created by Centurion's attorneys that would have merged Centurion with Oldsmar Pharmacy.  Smith immediately forwarded that to Taneja.  Two weeks later, Oldsmar Pharmacy's outside counsel at Shumaker Loop & Kendrick, LLP ("Shumaker") emailed both Taneja and Smith with revisions to the draft operating agreement.

52.     While Oldsmar Pharmacy worked with other marketing companies, Oldsmar Pharmacy – through Taneja and Smith – only considered merging with Centurion and making Centurion's marketers employees of Oldsmar Pharmacy because Centurion generated so many TRICARE prescriptions.

53.     Over the course of the next two months, every email from Oldsmar Pharmacy's attorneys at Shumaker went to both Taneja and Smith, including emails regarding additional draft agreements with Centurion, scheduled meetings, updates on communications with Centurion's outside counsel, and one email attaching a GAO report regarding TRICARE's payment practices.

54.     Although Oldsmar Pharmacy and Centurion were never able to reach a written arrangement approved by their respective attorneys, their illegal kickback arrangement continued – Centurion continued to generate compounded drug prescriptions it referred to Oldsmar Pharmacy, and Oldsmar Pharmacy continued to pay Centurion a

percentage commission from the amounts insurance paid to Oldsmar Pharmacy for those prescriptions.

55.     From November 2014 to February 2015, Oldsmar Pharmacy submitted over 4000 claims to TRICARE for compounded prescriptions that Centurion referred to Oldsmar Pharmacy to fill in exchange for commissions on the amounts insurance paid for each prescription.  TRICARE paid Oldsmar Pharmacy approximately $19,000,000 for those prescriptions.  Taneja and Smith discussed how much money they were making from TRICARE via Oldsmar Pharmacy.

56.     During that time, pursuant to the agreement that Taneja and Smith reached with Anderson, Oldsmar Pharmacy paid Centurion $12,602,190.44 in commissions for prescriptions, and Centurion then disbursed to its independent contractor sales representatives their share of those commissions.  Specifically, on the following dates Oldsmar Pharmacy made the following payments to Centurion for prescriptions Centurion referred to Oldsmar Pharmacy:

| Date | Payment |
|---|---|
| December 1, 2014 | $1,500,000 |
| December 15, 2014 | $500,000 |
| January 2, 2015 | $1,500,000 |
| January 20, 2015 | $2,647,305.89 |
| January 29, 2015 | $6,454,884.55 |
| **Total** | **$12,602,190.44** |

57.     Taneja knew that these monies Oldsmar Pharmacy paid to Centurion were, in turn, paid to Centurion marketers as commissions and, further, that those marketers were not employees of Oldsmar Pharmacy or Centurion.

58. The only work the Centurion marketers performed in exchange for their share of the commissions was to generate prescriptions that went to Oldsmar Pharmacy.

59. Consistent with those marketers' status as independent contractors, Oldsmar Pharmacy did not give them any specific work assignments. Other than providing the pre-printed prescription pads that the marketers used to generate prescriptions, Oldsmar Pharmacy did not control any aspect of the marketers' work or otherwise supervise the marketers.

60. On February 9, 2015, counsel for Centurion emailed counsel for Oldsmar Pharmacy expressing concern that Oldsmar Pharmacy had been making payments to Centurion without a signed agreement between the parties approved by their respective attorneys. Counsel for Oldsmar Pharmacy forwarded that email to Taneja and Smith.

61. The next day, the United States executed a search warrant on Oldsmar Pharmacy and others.

62. On February 13, 2015, DHA sent a letter to Smith suspending payments for present and future claims from Oldsmar Pharmacy.

63. The two owners of LifeCare, the two principals of Centurion (Monte and Anderson), and Dr. Baldizzi have all entered guilty pleas to federal felony criminal healthcare fraud charges.

**B.    Taneja was aware of the prohibitions of the Anti-Kickback Statute.**

64. During all relevant times, Taneja was aware of the prohibitions of the Anti-Kickback Statute. He has been an owner, officer, or executive of various healthcare companies for over 20 years. This includes roles as the vice president for sales and

marketing and later the CEO for a company that sold over-the-counter products and generic drugs from 2004-2012; a vice president focusing on sales for Belcher Pharmaceuticals, a generic drug manufacturing company, since 2012; the owner of Medvest since 2014, which provides services to physician; and he has controlled the operations of Sterling Knight Pharmaceuticals, a pharmaceutical manufacturer, since 2014.

65.     Additionally, in a conversation with Scott Roix – a marketer not affiliated with Centurion but with whom Oldsmar Pharmacy had a similar kickback arrangement – Taneja and Smith acknowledged that the commission payments to Centurion were illegal kickbacks.

66.     Further, as the Eleventh Circuit has noted, "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." U.S. v. Vernon, 723 F.3d 1234, 1256 (11th Cir. 2013) (internal citation omitted).

   **C.     Defendant's conduct was material.**

67.     As a condition of payment by TRICARE, a pharmacy must comply with the AKS and must not offer or pay anything of value to third parties in exchange for referring, arranging or recommending TRICARE patients for prescriptions to be filled by the pharmacy reimbursed by TRICARE.

68.     Pursuant to the Provider Agreements with ESI, Oldsmar Pharmacy falsely promised that it would comply with all applicable fraud, waste and abuse laws, which include the AKS and the FCA.  Oldsmar Pharmacy's promises to comply with all applicable fraud, waste, and abuse laws were material to its continued participation in the

TRICARE prescription benefit program administered by ESI.

69.     Defendant knew or should have known that compliance with the AKS was a material requirement for the pharmacy receiving TRICARE reimbursement.

70.     DHA has exercised its authority to suspend providers under investigation for fraud and abuse, including the payment of kickbacks.

71.     Neither Taneja nor Smith, nor any other person or entity acting on behalf on Oldsmar Pharmacy, ever informed DHA/TRICARE about – or sought its approval for – Oldsmar Pharmacy's payments to third-party marketers of a percentage commission of TRICARE's payments to Oldsmar Pharmacy for compounded drugs.

**D.     The United States suffered damages.**

72.     TRICARE paid approximately $19 million for prescriptions illegally induced by kickbacks to Oldsmar Pharmacy in connection with the scheme Taneja negotiated with Centurion from November 2014 until the February 2015 search warrant. In this time period, Oldsmar Pharmacy received payment for approximately 2,300 such claims from TRICARE.

73.     Following the United States' execution of a search warrant on Oldsmar Pharmacy – which effectively notified Oldsmar Pharmacy that the Government was aware of its improper conduct – Oldsmar Pharmacy paid more than $19 million to ESI, which included monies Oldsmar Pharmacy received from TRICARE for compounded drug claims referred from Centurion that Oldsmar Pharmacy had filled.  Additionally, following the search warrant, Oldsmar Pharmacy reversed – that is, withdrew and did not seek further payment for – approximately $20 million in pending compounded drug

claims that had been submitted to TRICARE but not yet paid.

**E.    Representative claims.**

74.    A.C. was a patient referred to Oldsmar Pharmacy by Centurion.  Oldsmar Pharmacy filled prescription No. 523526, which was signed by Dr. Victor Cruz, and submitted it to TRICARE for payment on November 17, 2014.  TRICARE reimbursed Oldsmar Pharmacy $6,415.07 for that prescription on December 10, 2014.  Oldsmar Pharmacy did not collect a copayment from A.C.

75.    A.H. was a patient referred to Oldsmar Pharmacy by Centurion.  Oldsmar Pharmacy filled prescription No. 526481, which was signed by Dr. Suneethi Patwari, and submitted it to TRICARE for payment on December 2, 2014.  TRICARE reimbursed Oldsmar Pharmacy $6,749.29 for that prescription on December 24, 2014.  Oldsmar Pharmacy did not collect a copayment from A.H.

76.    L.M. was a patient referred to Oldsmar Pharmacy by Centurion.  Oldsmar Pharmacy filled prescription No. 524128, which was signed by Dr. Victor Cruz, and submitted it to TRICARE for payment on December 26, 2014.  TRICARE reimbursed Oldsmar Pharmacy $8,576.59 for that prescription on January 21, 2015.  Oldsmar Pharmacy did not collect a copayment from L.M.

77.    B.H. was a patient referred to Oldsmar Pharmacy by Centurion.  Oldsmar Pharmacy filled prescription No. 538858, which was signed by Dr. Anthony Baldizzi, and submitted it to TRICARE on January 5, 2015.  TRICARE who paid Oldsmar Pharmacy $6,343.91 for that prescription on January 21, 2015.  Oldsmar Pharmacy did not collect a copayment from B.H.

78.     H.N. was a patient referred to Oldsmar Pharmacy by Centurion.  Oldsmar Pharmacy filled prescription No. 525006, which was signed by Dr. Anthony Baldizzi, and submitted it to TRICARE for payment on January 15, 2015.  TRICARE reimbursed Oldsmar Pharmacy $6,251.46 for that prescription on February 4, 2015.  Oldsmar Pharmacy did not collect a copayment from H.N.

### FIRST CAUSE OF ACTION
**(False or Fraudulent Claims)**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(A))**

79.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 78.

80.     By virtue of the acts described above, Defendant Taneja knowingly caused to be presented to an officer or employee of the United States false or fraudulent claims for payment or approval by TRICARE, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), amended by 31 U.S.C. § 3729(a)(1)(A); that is, Defendant knowingly caused to be made or presented to the United States claims for payment by TRICARE for compounded drugs for TRICARE patients, which claims were tainted by kickbacks Defendant made or caused to be made to marketers and patients.

81.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

### SECOND CAUSE OF ACTION
**(Conspiracy to violate the False Claims Act)**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(C))**

82.     The United States re-alleges and incorporates by reference the allegations

of paragraphs 1 through 78.

83.     By virtue of the acts described above, Defendant Taneja knowingly conspired and entered into an agreement to have the United States pay false or fraudulent claims by agreeing to pay kickbacks to marketers in return for prescriptions for compounded pharmaceutical products that Oldsmar Pharmacy would present to TRICARE for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729 (a)(1)(C).

84.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, the United States respectfully prays for judgment in its favor as follows:

1.     As to the First and Second Causes of Action (False Claims Act) against Defendant for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief this Court deems appropriate, to be determined at a trial by jury.

2.     All other and further relief as the Court may deem just and proper.

The United States hereby demands a jury trial on all claims alleged herein.

Respectfully submitted, this 13th day of January, 2021.


MARIA CHAPA LOPEZ
United States Attorney


By:   */s/ Michael R. Kenneth*
MICHAEL R. KENNETH
Assistant United States Attorney
Florida Bar No. 44341
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone:     813-274-6000
Facsimile:      813-274-6198
E-Mail:  michael.kenneth@usdoj.gov