UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

       Plaintiff,

v.                                   Case No. 8:21-cv-102-T-24AEP

MIHIR TANEJA

       Defendant.

_____/

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States' Complaint alleges that Defendant Mihir Taneja violated the False Claims Act by causing Oldsmar Pharmacy to submit claims to TRICARE for compounded pain and scar creams that were tainted by kickbacks to marketing company Centurion and by conspiring with the owners of Oldsmar Pharmacy and Centurion to get those claims paid. Specifically, in November 2014, the Defendant, his business partner Larry Smith, and the co-owner of Centurion, Kimberly Anderson, met to discuss how to distribute the proceeds of a kickback arrangement and, according to the Defendant, reached a handshake agreement. During further negotiations in December to resolve differences of the exact percentage kickback to pay, Smith made sure to include the Defendant and deferred to him during those communication. During the short but profitable length of the arrangement, the Defendant and Smith worked unsuccessfully with counsel to solve the problem of

paying kickbacks, but the fraudulent scheme went forward anyway.

The Defendant does not challenge that the kickback arrangement between Oldsmar Pharmacy and Centurion violated the False Claims Act. Instead, Defendant's Motion to Dismiss focuses on whether Taneja could be held liable for proximately causing the illegal kickback arrangement. Improperly making assumptions and drawing inferences in its favor, Defendant attempts to minimize Taneja's role. The Court must set aside those improper inferences, including as to the timing of the meeting between Taneja, Smith, and Anderson that began the kickback arrangement and as to who took part in the discussion that resolved the disagreement over the exact commission payment percentages. Considering the allegations of the Complaint and drawing proper inferences therefrom, the Government has sufficiently pleaded that Taneja caused the submission of false claims and conspired to violate the False Claims Act. Therefore, the Court should deny the Defendant's motion.

**Procedural Background**

In March 2015, relators filed a qui tam complaint against Larry Smith, Oldsmar Pharmacy, and 10 other defendants; the Defendant was not referenced in that complaint. U.S. ex rel. Silva, et al. v. Vici Marketing, LLC, et al., No 8:15-cv-444-T-33TGW (the "Oldsmar Pharmacy litigation"), Dkt. 1. In August 2018, the Government intervened against Smith, Oldsmar Pharmacy, and a corporate parent, as well as Scott Roix and his marketing companies, with whom the Government later settled. Id., Dkt. 24, 38.

As the Government explained in a filing last year, as a result of discovery in the Oldsmar Pharmacy litigation, the United States concluded that the Defendant may be liable under the False Claims Act. Id., Dkt. 142. The Government then sought information from the Defendant since mid-2019 through both formal and informal means. The parties unsuccessfully attempted to resolve the potential civil claims against Taneja, and the filing of this Complaint followed.

**Factual Background**

In May 2014, Defendant Taneja emailed Kim Anderson of Centurion describing a potential referral arrangement with Oldsmar Pharmacy, whereby Centurion would receive a percentage of revenues from insurance claims generated by Centurion. Dkt. 1, ¶ 36. In the email, Taneja referred to Larry Smith, the President of Oldsmar Pharmacy, who was copied on the email, as Taneja's partner, implied that Taneja and Smith operated the pharmacy together by referring to "our support staff," and implied that Taneja handled the financial aspects while Smith would handle "all the administrative aspects." Id.

However, Oldsmar Pharmacy and Centurion did not reach a deal in May 2014 or otherwise begin working together then. Centurion first worked with a different pharmacy, which paid higher commissions, but after that arrangement fell apart, Centurion turned back to Oldsmar Pharmacy in November 2014. Id. at ¶¶ 37, 39. Smith, Defendant, and Anderson met in Smith's office, and, according to Taneja's email, "discussed how we were going to distribute the money." Id. at ¶ 40. They reached a "handshake" agreement, and Centurion started sending claims to

Oldsmar Pharmacy that month. Id. at ¶¶ 39, 40. Although the exact timing of the meeting is unspecified, it is reasonable to infer that it occurred around the same time Centurion began referring prescriptions to Oldsmar. Id.

Around the same time, both sides of the deal – including Smith and Taneja for Oldsmar Pharmacy – turned to attorneys to try to address the legal problem in their arrangement: paying commission for TRICARE claims. Id. at ¶ 50. The volume of TRICARE claims that Centurion generated made Centurion unique among the marketing companies with whom Oldsmar Pharmacy worked, which is why Taneja and Smith retained counsel to try to merge with Centurion. Id. at ¶ 52. While the attempts to merge or otherwise come up with a legally permissible arrangement were unsuccessful, the scheme continued. Id. at ¶¶ 54, 56.

In mid-December 2014, when it was time to calculate the precise commissions, Anderson of Centurion reached out to Smith both by text and email to confirm the financial terms, and Smith – consistent with his role as the "administrative" half of Oldsmar Pharmacy – deferred to his partner Taneja. Id. at ¶ 40. Smith forwarded the email to Taneja, who responded to Anderson by disputing her account of agreed commission structure. Id. The parties then engaged in further discussions, resolved the issue, and the scheme was quickly back on track, with another payment to Centurion three days after Taneja's email. Id. at ¶¶ 41, 56.

Over the next two months until the execution of the search warrant, Oldsmar Pharmacy continued to submit claims (with about 4000 claims in total to TRICARE as a result of the arrangement) and to pay commissions to Centurion (more than $12

million, including for the government prescriptions). Id. at ¶¶ 55, 56. Taneja and Smith continued to work with Oldsmar Pharmacy's attorneys to address the problem of paying commissions on the TRICARE claims, but they paid the commissions anyway, as Taneja and Smith chose to continue the illegal activity, rather than wait for the attorneys to find a solution. Id. at ¶¶ 53, 56.[1]

While Taneja was not a legal owner, officer, or employee of Oldsmar Pharmacy, Taneja represented himself to Anderson at Centurion as a partner in the pharmacy, and he was treated both by Smith and by Oldsmar Pharmacy's attorneys as having decision-making authority.  Taneja referred to Oldsmar Pharmacy as his pharmacy, described the support staff at the pharmacy as his, lent employees from a company he owned to Oldsmar Pharmacy, discussed how much money he made from the pharmacy, and, most importantly, Oldsmar Pharmacy did not negotiate a deal or communicate with its attorneys without him. Id. at ¶¶ 34, 36, 40, 47, 53, 55.

**Legal Background**

    A. The False Claims Act

The False Claims Act was enacted to combat fraud against the federal government.  As the Supreme Court has explained, in enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification that

---

[1] The Government does not allege the attorneys working for Oldsmar Pharmacy and Centurion had any knowledge of the ongoing illegal payments.  In fact, Centurion's attorney emailed Oldsmar Pharmacy's attorney quite concerned when he learned that payments had already been made.  Dkt, 1, ¶ 60.  Before counsel for Oldsmar Pharmacy could respond, the search warrant was executed.  Id. at ¶ 61.

might result in financial loss to the Government.'" Cook Cty., Ill. v. United States ex rel. Chandler, 538 U.S. 119, 129 (2003) (citation omitted).

The FCA, among other things, imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Under Section 3729(a)(1)(A), liability exits either where the defendant directly submits the claims, or where the defendant "causes" another to submit the false claim. The FCA defines "knowingly" as "actual knowledge," "reckless disregard," or "deliberate ignorance" of truth or falsity, and expressly "require[s] no proof of specific intent to defraud." Id. § 3729(b)(1). A false claim is "material" if it has a natural tendency to influence, or is capable of influencing, the Government's payment decision. Id. § 3729(b)(4); see also Universal Health Services, Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989 (2016). A person who violates the FCA is liable for civil penalties and for three times the amount of the Government's damages. 31 U.S.C. § 3729(a)(1).

B.  The Anti-Kickback Statute

The AKS, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to a vulnerable patient population. See United States v. Patel, 778 F.3d 607, 615-17 (7th Cir. 2015) (discussing how kickbacks may corrupt the health care system, lead to costly overutilization, subvert patient choice, and result in the provision of harmful, unnecessary, or at best sub-par medical care).

6

The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for federally-funded medical services, including services provided under the TRICARE program. 42 U.S.C. § 1320a-7b(b).  In the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 757 (2010) (codified at 42 U.S.C. § 1320a-7b(g)), Congress made clear that a claim that violates the AKS is *per se* a false or fraudulent claim under the FCA. 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA].").

To prove an underlying violation of the AKS, the Government must show that the defendant acted "knowingly and willfully."  To act knowingly, a defendant must have acted "voluntarily and intentionally and not because of a mistake or by accident." United States ex rel. Williams v. Health Mgmt. Assocs., Inc., No. 3:09-cv-130, 2014 WL 2866250, at *12 (M.D. Ga. June 24, 2014).  Willfully means than an act was committed "voluntarily and purposely" with the "intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." United States v. Stark, 157 F.3d 833, 837-38 (11th Cir. 1998).  The Government does not need to show that the defendant acted with specific intent to violate the AKS.  42 U.S.C. § 1320a-7b(h).  A defendant's "willfulness" can be – and often is – proven through circumstantial evidence. U.S. v. Wetzel, 514 F.2d 175, 177 (8th Cir. 1975).  In discussing the AKS's willfulness requirement, the Eleventh Circuit has explained that "the giving or taking of kickbacks for medical referrals is hardly the sort of

7

activity a person might expect to be legal." U.S. v Vernon, 723 F.3d at 1234, 1256 (11th Cir. 2013).

### C. Standards for a Motion to Dismiss under Federal Rules of Civil Procedure 8(a)(2) and 9(b)

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a district court must accept the allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff – here, the United States. Magluta v. Samples, 375 F.3d 1269, 1273-74 (11th Cir. 2004); Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998). Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the plaintiff is entitled to relief, thereby giving the defendant fair notice of the basis for relief. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, all that is required to defeat a motion to dismiss is a complaint that sets forth sufficient factual allegations to plausibly support the relief requested. See Twombly, 550 U.S. at 570. A claim is plausible if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

With respect to the United States' allegations in this case, Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting fraud and mistake be stated with particularity, although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b), while requiring particularly, must not be interpreted to "abrogate the concept of notice pleading." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001). "Rule 9(b)

exists to prevent spurious charges and provide notice to defendants of their alleged misconduct, not to require plaintiffs to meet a summary judgment standard before proceeding to discovery." U.S ex rel. Napoli v. Premier Hospitalists PL, No. 8:14-cv-2952-T-33TBM, 2017 U.S. Dist. LEXIS 4458, *10 (M.D. Fla. Jan. 12, 2017) (internal citations omitted). As a result, "a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of Rule 9(b) with the broader policy of notice pleading." Friedlander v. Nims, 755.2d 810, 813 n.3 (11th Cir. 1985).

## ARGUMENT

The False Claims Act provides that any person who "knowingly" causes to be presented a "false or fraudulent claim" or "conspires to commit" a violation of the FCA is liable to the United States for three times the amount of damages that the Government sustained, plus civil penalties. 31 U.S.C. § 3729(a)(1)(A), (C). Taneja does not contest the sufficiency of the Government's allegations that the referral arrangement resulted in the submission of claims to TRICARE, which were rendered false by the payment of kickbacks. Nor does the Defendant contend the kickbacks were immaterial to the Government's decision to pay.

Instead, the Defendant's primary argument is that the Complaint does not sufficiently plead that he caused the presentment of the false claims. As set forth below, Taneja's argument is based on improper inferences and overlooks the allegations that he presented himself as having authority to act on behalf of Oldsmar Pharmacy, he proposed the referral arrangement between Oldsmar Pharmacy and

Centurion, he was involved in the documented discussions of the financial terms of the arrangement, he was treated as an indispensable party to the negotiations, and he knew commissions were being paid for TRICARE prescriptions as part of the scheme. These allegations are sufficient to plead that Taneja played a substantial role in causing the kickback scheme and the submission of claims to TRICARE was a reasonably foreseeable consequence of the scheme. Taneja's contentions that the Complaint insufficiently pleads conspiracy and scienter similarly ignore the well-pleaded allegations.

For these reasons, the Motion to Dismiss should be denied.

A. The Complaint describes with particularity Taneja's role in the kickback arrangement that foreseeably resulted in false claims.

Taneja's role in the negotiations of the kickback arrangement with Oldsmar Pharmacy and in trying to solve the problem of paying commissions on TRICARE claims sufficiently alleges how he caused the false claims.

The provisions of the False Claims Act, "considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." United States ex rel. Doe v. DeGregorio, 510 F. Supp. 2d 877, 884 (M.D. Fla. 2007) (quoting U.S. ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943)). The Eleventh Circuit recently adopted proximate causation to determine whether a defendant may be held liable under the FCA for causing the submission of false claims. Ruckh v. Salus Reahb., LLC, 963

F.3d 1089, 1107 (11th Cir. 2020).  Causes are proximate where they have a natural and foreseeable tendency to produce the harm in question, directly relate to that harm, and constitute a substantial factor in bringing about the harm.  See Staub v. Proctor Hosp., 562 U.S. 411, 419 (2011) (foreseeability and directness); Restatement (Second) of Torts § 431 (1965) (substantial factor).  A defendant may be found to have caused the submission of a claim if his conduct was (1) a "substantial factor" in inducing the submission of false claims and (2) "if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct."  Ruckh, 963 F.3d at 1107 (quoting U.S. ex rel. Schiff v. Marder, 208 F. Supp. 3d 1296, 1312-13 (S.D. Fla. 2016)).

      The Complaint's allegations against Taneja easily satisfy the first element of the Ruckh proximate causation test.  The Complaint pleads that Taneja was a substantial factor in bringing about the false claims by alleging that Taneja initiated the discussions with Anderson of Centurion; Taneja proposed a referral arrangement whereby Oldsmar Pharmacy would pay Centurion a percentage of the amount insurance paid to Oldsmar for prescriptions referred by Centurion; Taneja met with Smith and Anderson and discussed how they "were going to distribute the money," resulting in a handshake agreement; Taneja subsequently emailed with Anderson disputing her characterization of the agreed financial terms; and Taneja was involved in all of the discussions with counsel about how to solve the problem of Oldsmar Pharmacy paying Centurion for TRICARE claims.  Dkt. 1, ¶¶ 36, 40-41, 50-53.  As to the second element, the submission of claims to TRICARE tainted by the

kickback arrangement was reasonably foreseeable to Taneja by no later than November 2014, when Taneja and Smith began consulting with counsel regarding the arrangement given that TRICARE prescriptions were being referred under the scheme. Id. at ¶¶ 50, 52. These allegations are sufficient to plead that the submission of TRICARE claims was a reasonably foreseeable consequence of the scheme and that Taneja took critical acts in furtherance of the scheme. See United States ex rel. Tran v. Comput. Sci. Corp., 53 F. Supp. 3d 104, 127 (D.D.C. 2014) ("even where the non-submitting entity was not the prime mover of the alleged fraud, courts have found such entities potentially liable on the theory that they caused the presentation of false claims where they had agreed to take certain critical actions in furtherance of the fraud").

The Defendant's argument that he did not substantially cause the submission of false claims is based on a series of improper – and often illogical – inferences.

First, Taneja argues that his May 2014 email to Anderson was only an introduction (see Dkt. 17 at 16, 21), but Defendant's interpretation is not plausible. The Complaint alleges that Taneja's May 2014 email proposed a referral arrangement between Oldsmar Pharmacy and Centurion, and it is reasonably inferred from the email that Taneja had authority to negotiate the deal on behalf of Oldsmar, as Taneja referred to himself as Smith's partner, implied that he and Smith operated the pharmacy together by referring to "our support staff," and implied that Taneja handled the financial aspects of the business. While Taneja may deny his role in the scheme or present counter evidence at a later stage, the Court must draw

reasonable inferences in favor of the Plaintiff on a motion to dismiss.[2]

Second, the Defendant assumes that the meeting and handshake agreement Taneja described in his December 2014 email to Anderson took place in May 2014, several months before Centurion began referring TRICARE claims to Oldsmar in November 2014. See Dkt. 17 at 8, 16, 17, 19, 22. This illogical assumption allows the Defendant to characterize the "discussion" in Smith's office about how to split up the profits and the "handshake" deal reached between Smith, Taneja, and Anderson as inconsequential. While the date of the meeting is not stated in Taneja's December 2014 email, the reasonable inference is that the meeting, in which Taneja, Smith, and Anderson discussed "how they were going to distribute the money," which "resulted in a handshake," took place around the time that Centurion stopped working with Lifecare and began referring prescriptions to Oldsmar Pharmacy in November 2014. Dkt. 1 at ¶¶ 39-40.

Third, Taneja asks the Court to improperly infer that he was not part of working out the final financial terms of the kickback arrangement. In fact, this is the flawed premise of Defendant's entire motion (see Dkt. 17 at 2, 6, 9, 16, 17, 19, 22), but it is an inference at odds with the allegations that Taneja was involved in all preceding discussions regarding the financial terms of the arrangement. Specifically,

---

[2] Defendant also quibbles that the May 2014 email did not discuss TRICARE claims specifically, but the arrangement had not yet started then, so that is irrelevant. Dkt. 17 at 7, 19-20. As discussed further below, when they did reach an agreement in November 2014, Taneja (and Smith) were aware of the TRICARE claims and the illegal commissions they had promised to pay for them, which is why the companies pursued a merger.

13

when Taneja emailed Anderson in May 2014, he discussed the financial terms, and described Smith as handling the administrative side. Taneja, according to his email, was involved in negotiating the agreement that began the scheme in November. Then, when the parties realized they were not on the same page as to the exact financial distribution, Smith – both over email and text – deferred to Taneja. Dkt. 1, ¶ 40. Following that email, the parties had additional discussions that resolved the remaining disagreement. Id. at ¶ 41.

To support their inappropriate inference, the Defendant engages in an optimistic misreading of the allegations. The government did not allege – and it is not the case – that the email between Smith and Anderson finalized the agreement; instead, the agreement was finalized in those further discussions that followed the Taneja's email to Anderson (after Smith immediately handed the discussion off to Taneja to lead). Id. Like the meeting that Taneja described in his December email, the discussions in which the parties arrived at the final financial terms are not known to be recorded, but the result is evident in the email a few days later, as well as in the continuation of the scheme that had already begun. Dkt. 1 at ¶ 41.

It is *possible* that after having deferred to Taneja on the terms of the financial arrangement on December 12, 2014, Smith dramatically wrested control of the negotiations from Taneja in the next few days, proclaimed himself the negotiator for Oldsmar Pharmacy, and excluded Taneja from the process, but it is awfully unlikely. The inference the Court should draw in favor of the Plaintiff at this stage is that Taneja continued to participate in the negotiation of the kickback arrangement as

they worked out their differences offline, just as he had in November. However, even were the court to infer that Taneja was excluded from the final discussions, the key role that Taneja played in initiating the scheme and furthering the negotiations would nevertheless support a finding that his conduct was a substantial factor in bringing about the scheme and the resulting false claims.

Fourth and finally, Taneja argues that perhaps it was not reasonably foreseeable that the deal he negotiated involved TRICARE claims. See Dkt. 17 at 19-20. The Defendant's foreseeability argument builds off an earlier error: the deal Taneja describes negotiating was way back in May 2014, rather than when the arrangement began in November 2014. Id. Taneja's argument also ignores that the Complaint alleges that Taneja and Smith started working with counsel to consider a merger with Centurion because Centurion generated so many TRICARE prescriptions, and Oldsmar Pharmacy had agreed to pay commissions for those prescriptions. Dkt. 1 at ¶¶ 50, 52. As Defendant correctly observes, it is not a violation of the law to pay commissions on private insurance claims. Dkt. 17 at 19-20. Accordingly, if there were no TRICARE claims, Taneja and Smith had no need to go to attorneys about merging Oldsmar Pharmacy and Centurion when Oldsmar Pharmacy began submitting Centurion's claims in November 2014. The reason Taneja and Smith were talking to attorneys was *because of* the TRICARE claims generated by Centurion. The submission of TRICARE claims was thus a reasonably foreseeable consequence of the scheme by at least November 2014, when Centurion sent Oldsmar Pharmacy a proposed merger agreement. Dkt. 1 at ¶ 51.

15

Additionally, Taneja challenges the Complaint's reliance on Taneja's communications with Oldsmar Pharmacy's counsel, which Smith asserts are privileged. Id. at 15. Defendant assumes that all of the information regarding the communications with and between attorneys is inadmissible (id.), but (1) not all of the information comes from the referenced privilege log and (2) the Government can easily convert that information in the privilege log into admissible evidence during the course of discovery. Defendant also attempts to downplay the significance of Taneja's ongoing communications with Oldsmar Pharmacy's counsel during the scheme by assuming that Taneja is merely "copied" on emails. Id. at 16. This both assumes facts not in the Complaint and happens to be incorrect.³

But Defendant misses the more important inference to draw. The fact that Oldsmar Pharmacy's experienced healthcare law attorneys and that Smith's similarly experienced litigation counsel⁴ all treated the attorney-client privilege as applying to Taneja's communication with Oldsmar Pharmacy's counsel supports the inference that Taneja held decision-making authority for Oldsmar Pharmacy. U.S. v. Advanced Pain Mgmt. & Spine Specialists, No. 2:17-cv-272-FtM-29MRM, 2018 U.S. Dist. LEXIS 219924, *21-24 (M.D. Fla. June 28, 2018) (the attorney-client privilege may apply to a third-party, such as a consultant, when the individual functions as an employee, possesses decision making responsibility, is part of the

---

³ Defendant also assumes Anderson cooperated with the Government. Dkt. 17 at p. 18. She did not.
⁴ During the Oldsmar Pharmacy litigation, Smith was represented by Gregory Kehoe and Danielle Kemp of Greenberg Traurig.

chain of command, or is personally responsible for activity that might lead to liability for the corporation). Defendant asks the Court to infer that Taneja played an insignificant role, which would require believing that experienced attorneys improperly invoked the privilege. This is unlikely.

Notably, Taneja cites no case law holding that someone who was part of negotiating a kickback scheme cannot cause the presentment of false claims, or that an individual responsible for negotiating an illegal scheme evades responsibility under the False Claims Act when he was not also responsible for every step of its implementation. Moreover, personal benefit to the defendant is not required to prove False Claims Act liability. DeGregorio, 510 F. Supp. 2d at 885.[5]

The Defendant attempts to distract the Court by demanding far more than Rule 9(b) requires. For example, Taneja demands the Government describe the exact parameters of their business relationship. See Dkt. 17 at 5. At least with respect to Oldsmar Pharmacy, Taneja adequately summarizes the division of labor of their partnership in his first communication with Anderson. More generally, Rule 9(b) requires a plaintiff to set forth the fraud scheme with particularity, but does not require every single allegation in the Complaint be described with particularity as notice pleading still applies.

---

[5] The Defendant also refers to a lack of damages because the money obtained from TRICARE was returned following the execution of the search warrant. Dkt. 17 at p. 9. Judge Covington already rejected this argument and found that returning the money after law enforcement arrives does not eliminate liability, but is an offset after damages are trebled. Oldsmar Pharmacy litigation, Dkt. 89 at pp. 19-20.

The Defendant only challenges whether Taneja can be held legally liable for causing the illegal kickback arrangement. Based on the allegations of the Complaint, he can. The Complaint satisfies the <u>Ruckh</u> causation test by plausibly alleging (1) that by Taneja proposing and negotiating the deal he is a substantial factor in the arrangement and (2) that the submission of TRICARE claims was reasonably foreseeable to him, as he and Smith sought to merge Oldsmar Pharmacy with Centurion to address that exact issue.

> B. <u>Taneja entered into a conspiracy with Smith and Anderson to violate the False Claims Act.</u>

The Defendant's arguments about the conspiracy count are undermined by the same inferences and assumptions described above. A defendant may be liable for conspiracy under the FCA when the defendant conspired with one or more persons to have a false claim paid by the United States; one or more of the conspirators performed an act to further the conspiracy; and the United States suffered damages. <u>Corsello v. Lincare</u>, 428 F.3d 1008, 1014 (11th Cir. 2005). Here, contrary to Defendant's argument, the Complaint in fact alleges in particularity a meeting between Taneja, Smith, and Anderson, described by Taneja in a December 2014 email, in which they discussed the distribution of the proceeds of the arrangement, which resulted in a "handshake" agreement. Dkt. 1, ¶ 40. The Complaint describes discussions subsequent to the meeting in which they worked out their differences over the financial terms. <u>Id</u>. ¶¶ 40-41. Pursuant to the agreement, Oldsmar Pharmacy submitted claims to TRICARE and paid kickbacks to Centurion for

referring TRICARE prescriptions; and the United States paid over $19 million for fraudulent claims. Dkt. 1 ¶¶ 42-44, 55-56. Having alleged the agreement, overt acts, and damages, the United States adequately alleges the conspiracy. See <u>U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs.</u>, No. 8:06-cv-24-T-24MAP, 2007 U.S. Dist. LEXIS 96344, *27 (M.D. Fla. Nov. 30, 2007) (finding the plaintiff adequately alleged a conspiracy to violate the False Claims Act)

> C. <u>The Complaint alleges that Taneja was aware that the scheme involved claims to TRICARE rendered illegal by the commissions paid.</u>

To the extent that Taneja alleges the Complaint insufficiently pleads his awareness of the illegality of the referral arrangement that he negotiated, his argument must be rejected as the Complaint satisfies the applicable pleading standard. The Government alleges that Taneja was aware of the prohibitions of the Anti-Kickback Statute as an experienced healthcare executive. Dkt. 1 at ¶ 64. As noted above, the Defendant was aware that the referral arrangement that he negotiated was illegal, which is why he and Smith immediately – and continually throughout the scheme – worked with attorneys to try to create a legal means to pay Centurion commissions for the prescriptions. <u>Id.</u> at ¶¶ 50-54. The Defendant was also aware that the funds paid to Centurion were commissions and that TRICARE was a substantial source of Oldsmar Pharmacy's income. <u>Id.</u> at ¶¶ 55, 57. Accordingly, the Government meets its burden under Rule 8 to allege scienter.

## Conclusion

For the foregoing reasons, the Motion to Dismiss should be denied.[6]

Respectfully submitted, this 13th day of May 2021.

                                                      KARIN HOPPMANN
                                                    Acting United States Attorney

By: */s/ Michael R. Kenneth*
     MICHAEL R. KENNETH
     Assistant United States Attorney
     Florida Bar No. 44341
     400 North Tampa Street, Suite 3200
     Tampa, Florida 33602
     Telephone:   813-274-6000
     Facsimile:   813-274-6198
     E-Mail:  michael.kenneth@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties of record.

                                      */s/ Michael R. Kenneth*
                                      Michael R. Kenneth
                                      Assistant United States Attorney

---

[6] Should the Court dismiss any of the United States' claims, the Government respectfully requests that the such dismissal be without prejudice and that the United States be granted an opportunity to amend its Complaint.  Federal Rule of Civil Procedure 15(a)(2) states that a "court should freely give leave [to amend] when justice so requires."  "Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint."  Corsello, 428 F.3d at 1014.  The United States' January 13, 2021 Complaint was the first filed by the Government in this action, and the present motion to dismiss is the Defendant's first responsive pleading in this case.  The Court should thus grant leave to amend the Complaint should any portion of the Defendant's motion be granted.